# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LORI TENAN, | ) |
|     Plaintiff/Counterclaim Defendant, | ) ) ) ) |
| v. | ) No. 15 C 5170 ) ) Judge Sara L. Ellis |
| STRATEGIQ COMMERCE, LLC, | ) ) |
|     Defendant/Counterclaim Plaintiff. | ) ) ) |

## OPINION AND ORDER

After Defendant StrategIQ Commerce, LLC ("SIQ") terminated Plaintiff Lori Tenan's contract, Tenan filed this lawsuit seeking to recover commissions she claims remain due under that contract. Tenan brings two claims against SIQ: (1) breach of contract for failing to pay commissions due, and (2) violation of the Illinois Sales Representative Act (the "ISRA"), 820 Ill. Comp. Stat. 120/0.01 *et seq.*[1] SIQ filed counterclaims for Tenan's alleged breach of the same contract for unauthorized use of SIQ's confidential information, failure to return confidential information, and violation of the non-solicitation provision, in addition to claims for breach of fiduciary duty, tortious interference with prospective economic advantage, and unjust enrichment. The Court has before it SIQ's motion for summary judgment on Tenan's complaint, which the Court grants. Because the record establishes that Tenan acted as a sales or service agent for other entities without obtaining SIQ's consent, which violated her contract and provided SIQ with cause to terminate the contract, Tenan cannot recover any additional

---

[1] The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). The parties have confirmed that they are citizens of different states, providing additional details regarding the citizenship of SIQ's members as requested by the Court. *See* Doc. 189.

commissions under the contract. And because SIQ does not sell products as required for the ISRA to apply to Tenan, she cannot recover on her ISRA claim.

## BACKGROUND[2]

### I. Tenan's Relationship with SIQ

SIQ provides shipping and delivery solutions to retailers. It analyzes shipping, carrier, order, tracking, return, and other data for these clients, allowing them to monitor and improve their shipping and transit processes. SIQ also provides clients with shipping audit and contract negotiation services. Tenan began working for SIQ in 2008 as a sales representative. Her 2008 employment agreement provided Tenan with a $75,000 per year salary in addition to graduated commissions capped at 17% on all revenue generated over $1,000,000. In 2012, Tenan's sales accounted for approximately one-third of SIQ's annual revenue generated from sales representatives. SIQ's CEO, Jonathan Shaver, advised Tenan that SIQ could not pay her as contractually obligated and so, with the aid of counsel, SIQ restructured her contract to reduce the commission rate. After Tenan threatened to sue SIQ for breach of contract, SIQ agreed to pay Tenan $200,000 and give her the option of working for SIQ as an independent contractor. On November 2, 2012, Tenan and SIQ entered into an Amended Employment Agreement ("AEA"), which incorporated an Independent Contractor Sales Agent Agreement ("SAA"). In May 2013, Tenan notified SIQ of her decision to become an independent contractor pursuant to the AEA. SIQ continued to compensate Tenan as an employee, however. Shaver did not advise Rich Kropski, SIQ's chief operating officer, of this change in Tenan's employment status, and Kropski did not believe that Tenan's job responsibilities changed under the SAA.

---

[2] The facts in this section are derived from the Joint Statement of Undisputed Material Facts and attached exhibits. All facts are taken in the light most favorable to Tenan, the non-movant. The Court cites to the Joint Statement in addition to the exhibits filed at Doc. 174 by exhibit number.

The SAA stated that, as an independent contractor for SIQ, Tenan would provide certain services to SIQ on a part-time basis. Specifically, she had responsibility for servicing "Client List Customers," which included American Apparel, Beachmint, Forever 21, Gilt Groupe, Macy's, Nestle Corporation, and Zumiez. SIQ agreed to pay Tenan commissions on the current services it provided to Client List Customers, "Existing Services" sold to new or existing SIQ customers, and "New Services" Tenan sold to existing or prospective SIQ customers. The SAA defined "Existing Services" as:

- Shipping Expense Management services including
  - Parcel Audit
  - Freight Audit
  - Freight Allocation Services
- Parcel Contract Enhancement Services (support of client renegotiation of parcel contracts)
- Shipping Analytic Services
- Outbound Order IQ
  - Integration of Order Data to Shipping Data
  - Matching Order data to Shipping Data
  - Allocation of freight data within an order
- Inbound Order IQ
  - Integration of P.O. Data
  - Inbound import freight audit
  - Verification of Trade Compliance

Ex. 3, SAA § 4(c). It also listed the current services provided to Client List Customers, using the same terminology as in the definition of Existing Services. "New Services" meant "new services not yet created by [SIQ] as of the Effective Date" of the SAA. SAA § 4(d). The SAA provided SIQ with a right of first refusal for the sale of any services or solutions similar to SIQ's Existing Services that Tenan sought to sell. Tenan also agreed that, during the term of the SAA, she would not provide services to another person or entity that offered New or Existing Services without first notifying SIQ in writing and obtaining its consent.

The SAA included confidentiality and non-solicitation provisions. Specifically, with respect to confidential information, the SAA stated:

> Tenan acknowledges that [SIQ's] "Confidential Information" (as defined below) constitutes a protectable interest of [SIQ], and covenants and agrees that at all times during the period that Tenan is providing Services to [SIQ], and at all times after Tenan ceases providing such Services, Tenan will not, directly or indirectly, disclose, furnish, make available or utilize any Confidential Information other than in the course of performing the Services. . . . Tenan's obligations under this section with respect to particular Confidential Information will survive expiration or termination of this [SAA], and will terminate only at such time (if any) as the Confidential Information in question becomes generally known to the public other than through a breach of Tenan's obligations under this [SAA].

SAA § 5(a). The SAA defined "Confidential Information" as:

> any and all confidential, proprietary or trade secret information, whether disclosed, directly or indirectly, verbally, in writing or by any other means in tangible or intangible form, applicable to or in any way related to: (i) the present or future business of [SIQ] or any of its Affiliates . . . ; (ii) the research and development of the Company or any of its Affiliates; or (iii) the business of any client or vendor of [SIQ] or any of its Affiliates.

SAA § 5(b). It gave examples of Confidential Information, including, "plans or strategies for marketing, development and pricing, business plans, financial statements, profit margins and all confidential information concerning existing or potential clients, suppliers or vendors." *Id.* Tenan agreed to surrender all Confidential Information, and all "property, client lists, notes, manuals, reports, documents and other things" in her possession that related to Confidential Information upon the termination of the SAA. SAA § 5(c). The confidentiality provisions of the AEA, which mirror those in the SAA, also remained in effect. Under the SAA's non-solicitation provision, Tenan agreed not to "utilize [SIQ's] Confidential Information or any other unlawful means to solicit any of [SIQ's] clients or customers at any time during Tenan's employment with [SIQ] or during the period that Tenan was providing Services as a Sales Agent." SAA § 6(b).

4

The non-solicitation provision extended for a year after the termination of the SAA, with Tenan also bound by a similar provision found in the AEA for the same time period.

Although Tenan could terminate the SAA at any time, SIQ could only terminate it "for cause, at which time Tenan shall immediately cease to be eligible to receive any further commissions under this [SAA] except as provided by law." SAA § 10. The SAA defines "cause" as:

> (a) performing Services intoxicated or under the influence of illegal drugs;
>
> (b) substantial and repeated failure to perform material duties, which is not cured to [SIQ's] reasonable satisfaction within 30 days after written notice thereof to Tenan . . . ;
>
> (c) material gross negligence or material willful misconduct with respect to [SIQ] or any of its Affiliates;
>
> (d) material theft, fraud or embezzlement on the part of Tenan; and
>
> (e) serving as a sales or service agent of Existing Services . . . or New Services for a competitor of [SIQ] during the term of the [SAA] without first seeking prior approval from [SIQ].

SAA § 10.

SIQ Client Services Manager Bill Bearden, who directly supervised Tenan at SIQ under the SAA, testified that Tenan routinely did not respond to his requests for reports, schedules, and presentation material, or otherwise responded defensively. For example, on July 19, 2013, Bearden emailed Tenan, expressing concerns he had with her recent performance, noting his expectation that Tenan would host and lead client calls, and instructing Tenan not to schedule calls back-to-back or on the same conference line at overlapping times. On the same day, Bearden also requested information related to scheduled quarterly business review and monthly service review presentations for certain clients. Bearden followed up on July 23, indicating that

5

he needed the information within the hour. Tenan responded the following day, indicating that her contract did not require her to meet his requests or stated expectations. After Bearden made a similar request for presentations on August 6, Tenan responded on August 8 that, pursuant to her role as an independent contractor, she did not need to participate in or lead monthly operational calls. She attached her independent contractor agreement to the email, but Bearden did not review the file. Tenan also informed Bearden on August 9 that she did not need to prepare customer business reviews or provide him with any presentations. She further stated she would only inform SIQ about the status of meetings and presentations with clients if she determined such disclosure was best for the client relationship. Tenan similarly informed other SIQ employees of her independent contractor status and reduced role with SIQ in August.

In February 2011, Tenan forwarded a 600-page document with shipping data from SIQ's client American Apparel to Mark Turner, with whom she later worked. In August and September 2013, she sent copies of SIQ materials from her SIQ email account to her Gmail account. These documents included an SIQ presentation for Overstock, which was marked proprietary and confidential and included carrier spend reports and SIQ's fee, notes on Nespresso's needs from SIQ, SIQ's pricing information, business requirements, and objections, fee, and negotiations with SIQ client DJO, and information from Zumiez related to orders, contacts, and returns on investment.

On July 25, August 6, and August 19, 2013, SIQ sent Tenan's counsel correspondence that Tenan's conduct caused disruptions, breached her agreements with SIQ, and posed conflicts of interest. The letters also reminded Tenan of her confidentiality obligations and that she should not use her personal computer to conduct SIQ business. In September, Bearden informed Tenan that her "unpredictable availability, lack of preparedness, and derogatory tone regarding [SIQ]"

interfered with SIQ's ability to provide quality services to its customers. Doc. 174 ¶ 40. Bearden also noted his displeasure with Tenan making a derogatory comment to another SIQ employee while on a call with a customer. In fall 2013, Tenan filed suit in the Circuit Court of Cook County, seeking a declaration that she was an independent contractor and not an SIQ full-time employee. On November 15, 2013, SIQ's counsel sent written notice to Tenan's counsel stating that SIQ had terminated Tenan for cause as of that date for, among other reasons, "material misrepresentations and improperly soliciting and interfering with clients of [SIQ]." *Id.* ¶ 89. SIQ also demanded that Tenan return all confidential information to SIQ and cease use of that information. In January 2014, SIQ again sent a request that Tenan return SIQ's confidential information. The Illinois state court overseeing Tenan's case ordered Tenan to image her personal computer and share its contents with SIQ shortly thereafter. Tenan received approximately $160,000 in compensation from SIQ between May and November 2013, with SIQ paying her all compensation and commissions owed under the Sales Agent Agreement and any other agreement through November 15, 2013.

## II.     Tenan's Other Sales-Related Work

Tenan founded and owns LST Consulting ("LST"). She also formed LTB Technologies, LLC ("LTB") with Brendan Baker in January 2010. Although not involved in LTB's day-to-day operations or management, Tenan earned approximately $58,727 from LTB in 2012 and 2013. In March, April, and June 2013, Baker copied Tenan on emails concerning the sale of envelopes to a client, with Tenan participating in these discussions in May 2013. Similarly, Baker included Tenan on an email to Priority Mailing Systems, also known as Neopost, related to LTB's sales of envelopes for Neopost on July 24, 2013. Like SIQ, Neopost offers shipping and tracking solutions, and provides analyses of mail and shipping operations for its clients. In September

7

2013, Beachmint, an SIQ customer, emailed Baker at his LTB email address, as well as Tenan, concerning a purchase order for envelopes.  Tenan did not inform SIQ of her involvement in LTB until December 2017.  Tenan, however, did not sell specialty envelopes while working with SIQ.

Tenan also worked with Postal Advocate, which provides services to customers seeking to manage their mailing processes, optimize operations, and reduce spending, and which SIQ considers a competitor with respect to shipping expense management services.  On August 5, 2013, Tenan asked Postal Advocate's president, Adam Lewenberg, to send her the agreement between LST and Postal Advocate so she could have someone look over the document and begin selling for Postal Advocate.  Lewenberg provided agreements and reminded Tenan of a call with Aegon the following day.  Lewenberg had earlier copied Tenan on an email to Aegon soliciting Aegon's business.  In December 2013, Lewenberg emailed Tenan to ask her to check on outstanding invoices for services Postal Advocate provided to Nestle earlier in the year.  Later that month, Lewenberg emailed Tenan indicating that Postal Advocates had made a payment to LTB for its share from services Postal Advocate provided to Nestle and other customers between April and September 2013.  These services included eliminating mailing equipment insurance and lost postage recovery services.

In the summer of 2013, Tenan contacted POWA Technologies ("POWA") about working as a consultant to sell POWA's products and services.  She worked for POWA from August 2013 to June 2014, entering into an employment and confidentiality agreement on September 20, 2013.  Tenan acknowledged that she "probably" reached out to SIQ's clients in marketing POWA's products and services, which is reflected at least in an email she sent to Nespresso marketing POWA's Omni channel solution.  This technology sought to provide customers with a

8

seamless and innovative shopping experience through various channels, with customers able to order products by taking photos of them or holding up their phones while watching television.

Tenan currently works for Narvar, which provides delivery tracking analytics, SMS shipping alerts, returns management, feedback collection, and communications services. Tenan began discussions with Narvar about a consulting agreement in July 2013 and entered into consulting and confidentiality agreements between Narvar and LST in August and September 2013. She entered into another consulting agreement with Narvar on July 21, 2014, which defined her duties as helping with pitch presentations, working on pricing arrangements, and meeting with clients to discuss Narvar's products and services. The agreement also emphasized the importance of not performing similar services for other companies. On March 1, 2015, Tenan entered an employment agreement with Narvar, assuming the position of Vice President of Sales.

In September 2013, Amit Sharma, Narvar's founder and CEO, sent Narvar's pricing tier information to Tenan. Sharma and Tenan pitched Narvar's tracking services to Zumiez, with Tenan creating a presentation for Zumiez and answering questions from Zumiez's representatives. Zumiez contracted with Narvar and implemented its services on November 27, 2013. Tenan also contacted Nespresso to present Narvar's services and pricing to it in September 2013. That same month, she created a presentation for Macy's, eventually winning its business.

Between August 18, 2014, and March 2015, Tenan also provided services to Attraqt, Inc. In September 2014, she exchanged emails with Turner about a draft agreement between Attraqt and Forever 21, an SIQ customer. She also participated in the pitch meeting with Forever 21, presenting both Attraqt's and Narvar's services.

9

While Tenan worked for SIQ, SIQ marketed certain services to American Apparel and its employee, Spencer Smith, including shipping administration services, freight auditing services, shipping expense management services, and import and export trade compliance and audit services. Smith eventually left American Apparel to work for Beachmint. Smith retained both Narvar and SIQ while at Beachmint because he understood them to provide different services, with Narvar providing consumer-facing communication and SIQ providing back office audits and cost savings measures.

Tenan did not inform SIQ until December 2017 that she had conducted business through or for LTB, LST, Neopost, Postal Advocate, POWA, and Narvar while working with SIQ. Nor did she inform SIQ until then that she had marketed other companies' services to Beachmint, Gilt, Nestle, Nespresso, Macy's, or Zumiez.

**LEGAL STANDARD**

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v.*

*Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

**I.      Breach of Contract**

SIQ seeks summary judgment on Tenan's breach of contract claim, arguing that because Tenan materially breached the contract, it does not owe her the commissions she seeks. To prevail on her breach of contract claim, Tenan must prove (1) the existence of a valid, enforceable contract; (2) her performance of all required conditions under the contract; (3) SIQ's breach of the contract; and (4) resulting injury. *Henderson-Smith & Assocs., Inc. v. Nahamani Family Serv. Ctr., Inc.*, 752 N.E.2d 33, 43, 323 Ill. App. 3d 15, 256 Ill. Dec. 488 (2001).

SIQ argues that Tenan materially breached the SAA and cannot show that SIQ breached the contract. Specifically, SIQ contends that Tenan breached the SAA by (1) selling Existing and New Services for other entities without SIQ's consent; (2) failing to offer SIQ a right of first refusal for various sales opportunities; (3) violating the confidentiality provision by taking, disclosing, and refusing to return SIQ's Confidential Information; (4) soliciting SIQ's customers using SIQ's Confidential Information; and (5) failing to perform the sales duties set forth in the SAA. SIQ also argues that Tenan breached the AEA by engaging in other business activities without disclosing them to SIQ, a violation SIQ claims barred Tenan from exercising her option to enter into the SAA. Tenan does not contest the materiality of any of these alleged breaches and instead argues that fact questions prevent the entry of judgment.

The Court need only address whether Tenan served as a sales or services agent of New or Existing Services for an SIQ competitor during the term of the SAA without seeking prior

11

approval from SIQ between May 2013 and November 15, 2013. Tenan first argues that the Court cannot find for SIQ on summary judgment because the terms New and Existing Services are ambiguous, leaving questions of fact as to which services fall within these categories. A contract "is to be construed as a whole, giving effect to every provision, if possible, because it must be assumed that every provision was intended to serve a purpose." *Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213, 213 Ill. 2d 141, 290 Ill. Dec. 155 (2004). Although Tenan appears to claim the term Existing Services is "obscure in meaning through indefiniteness of expression," *id.* (quoting *Platt v. Gateway Int'l Motorsports Corp.*, 813 N.E.2d 279, 283, 315 Ill. App. 3d 326, 286 Ill. Dec. 222 (2004)), the SAA explicitly defines Existing Services by providing an enumerated list of qualifying services. It also lists which of the Existing Services each of Tenan's existing clients used. And while Tenan further claims the definition would be difficult for someone to understand, she offers only conclusory arguments without suggesting different interpretations for the terms in question. Without a basis to find a specific ambiguity and instead presented with an enumerated list of Existing Services, the Court applies the plain meaning of these terms in line with industry usage. *Va. Sur. Co. v. N. Ins. Co. of N.Y.*, 866 N.E.2d 149, 153, 224 Ill. 2d 550, 310 Ill. Dec. 338 (2007) ("If the contract language is unambiguous, it should be given its plain and ordinary meaning."); *Intersport, Inc. v. Nat'l Collegiate Athletic Ass'n*, 885 N.E.2d 532, 539, 381 Ill. App. 3d 312 219 Ill. Dec. 261 (2008) ("Contract terms should also be interpreted in accordance with the custom and usage of those particular terms in the trade or industry of the parties. . . . [T]he contract terms need not be found to be ambiguous before evidence of the custom and usage of the terms in the parties' trade or practice can be considered.").[3]

---

[3] The Court need not address Tenan's argument that New Services is also an ambiguous term, where SIQ does not argue that Tenan violated the SAA by selling any New Services for another entity. Indeed, SIQ

Alternatively, Tenan argues that the Court must carefully consider whether she had opportunities to sell Existing Services, as defined in the SAA, for companies aside from SIQ during the term of the SAA. She claims the undisputed facts do not establish any such opportunities, but she does so without addressing each of SIQ's examples. Having reviewed the record, the Court finds that Tenan violated the SAA by selling Existing Services for both Narvar and Postal Advocate but that questions of fact prevent the Court from making the same determination with respect to Neopost and POWA. The questions surrounding these two companies do not preclude a finding that Tenan violated the SAA where one such violation suffices.

A. Narvar

On August 28, 2013, while the SAA was in force, Tenan entered into a consulting agreement with Narvar. She agreed to provide "sales services for Narvar White Label Tracking Interact, Return Portal Interface, [and] Vendor Portal," with the agreement excluding "any freight audits or other services provided by [SIQ]." Ex. 46 at Tenan's HD 00217. Despite the inclusion of this language in the consulting agreement, Tenan engaged with customers to sell Narvar's tracking solutions, which included shipping, delivery, and return information. SIQ provided similar services to Narvar, which amounted to Shipping Analytic Services and therefore Existing Services under the SAA. Specifically, in September 2013, Tenan revised a presentation for Zumiez on Narvar's tracking services. Later in the fall, Narvar entered into a contract to provide its tracking services to Zumiez, fully implementing Narvar's solution on November 27, 2013. Also in September 2013, Tenan presented shipping and tracking solutions

---

does not provide any evidence of any additional services it had not created at the time Tenan invoked the SAA that Tenan thereafter sold for another entity during the term of the SAA.

13

from both SIQ and Narvar to Nespresso. She delivered a presentation like that she created for Zumiez to Macy's. After further discussions, Macy's became one of Narvar's clients.

Tenan argues that Narvar provided customers with a consumer-facing branded tracking platform, which differs from SIQ's back-end analysis of shipping information. But it is undisputed that SIQ provides clients with shipping, tracking, delivery, and return information, with additional monitoring capabilities. While Narvar may provide additional services that SIQ does not, this does not change the fact that they both provide customers with Shipping Analytic Services, which Tenan pitched for Narvar without obtaining SIQ's consent. The language used in Tenan's consulting agreement with Narvar, fashioned by counsel, does not absolve her from this breach of the SAA, where Tenan's actions demonstrate that she provided services beyond those contemplated by her Narvar agreement. Therefore, the Court finds that, having failed to obtain SIQ's consent, Tenan's work for Narvar properly served as a basis for SIQ to terminate the SAA and for judgment in SIQ's favor.

### B. Postal Advocate

While the SAA was in effect, Tenan worked to sell Postal Advocate's services to, among others, Nestle. Postal Advocate helps companies manage their mailing processes, optimize operations, and reduce spending by, among other things, identifying vendor overcharges. Tenan does not dispute that Postal Advocate's services are the same or substantially similar to the SAA's Shipping Expense Management services, which include Parcel and Freight Audit service and Freight Allocation Services. In December 2013, Tenan received payment for services she rendered to Postal Advocate through LTB and/or LST Consulting and which were invoiced to clients between May and September 2013. The invoices covered vendor credits and other fee

savings that Postal Advocate obtained for its clients.[4]  Also, in July 2013, Tenan was copied on an email to a Postal Advocate potential client, which laid out reasons for that company to work with Postal Advocate to reduce mailing equipment costs, including by eliminating avoidable fees, contract overcharges, and lost postage.  These services undisputedly fall within Existing Services.

Tenan argues, however, that LTB provided the services to Postal Advocate, and that she had no day-to-day involvement in LTB.  But in August 2013, she received draft contracts to memorialize the work she performed for Postal Advocate.  And Postal Advocate directed questions and payment to Tenan, further establishing more than just passive involvement with Postal Advocate.  Tenan's work with Postal Advocate without obtaining SIQ's consent thus provides another basis for finding for SIQ.

C.     Neopost

Neopost offers shipping and tracking solutions to customers, including analytics for managing costs and determining incorrect addresses and lost packages.  These services are the same or substantially similar to those offered by SIQ as Shipping Expense Management Services.  Tenan and LTB worked with Neopost in July 2013 to sell envelopes to a client.  But the products they marketed on Neopost's behalf, envelopes, are not covered as Existing Services.  Tenan also never sold envelopes for SIQ nor does SIQ present evidence that the sale of envelopes amounts to a New Service covered by the SAA.  Although Neopost's overall business competed with SIQ's Existing Services, by the terms of the SAA, she could sell envelopes for

---

[4] Tenan attempts to characterize LTB's work for Postal Advocates as involving the sale of Pitney Bowes postage machines.  *See* Doc. 183 at 3.  But the invoices reflect expense management services provided to Postal Advocates' clients, such as eliminating unneeded equipment insurance and recovery of lost postage funds, not the sale of tangible postage machines.

Neopost without having to obtain SIQ's consent. Therefore, the Court cannot find that Tenan's work with Neopost provided a basis for SIQ's termination of the SAA.

### D. POWA

Although SIQ argues that Tenan sold competing services for POWA, it does not provide sufficient evidence for the Court to conclude that Tenan's work for POWA directly competed with any of SIQ's Existing Services. Tenan did enter into a consulting agreement, and later an employment agreement, with POWA, but these agreements do not specify the types of services she marketed for POWA. While Tenan did reach out to Nespresso in September 2013 about POWA's Omni channel solution, the record does not sufficiently support that such a solution amounts to an Existing Service. Indeed, Tenan's email to Nespresso suggests that POWA's technologies addressed customers purchasing products in innovative ways, not any shipping or delivery solutions. Therefore, based on the record before it, the Court finds a dispute exists over whether Tenan sold Existing Services for POWA. But this dispute does not require a trial, where the record establishes that she marketed and sold Existing Services for Narvar and Postal Advocate during the term of the SAA without obtaining SIQ's consent. And, based on the SAA's clear language, these violations of the SAA provide a basis for SIQ's termination of the SAA for cause and prevents Tenan from recovering the additional commissions she seeks.

## II. ISRA Claim

Next, SIQ argues that the ISRA does not provide Tenan with a remedy for unpaid commissions because the ISRA does not cover the services she sold for SIQ. The ISRA requires "principals" to pay commissions due to their sales representatives according to a specified schedule. The ISRA defines "principal" as "a sole proprietorship, partnership, corporation or other business entity . . . which . . . [m]anufactures, produces, imports, or distributes a product

16

for sale." 820 Ill. Comp. Stat. 120/1(3)(A). Courts have held that the statutory language used to define principal demonstrates that the ISRA "applies only to the sale of tangible goods, not the sale of services." *Allen v. Giannecchini*, No. 08 C 6589, 2010 WL 8034236, at *4 (N.D. Ill. Sept. 7, 2010); *see Springhead, LLC v. Solution Publ'g, LLC*, No. 13 C 436, 2015 WL 1280702, at *3 (N.D. Ill. Mar. 18, 2015) (collecting cases holding that "product" refers to "tangible, manufactured goods, not [to] intangible items or services" (alteration in original) (citation omitted)).

Here, SIQ provides shipping expense management and analytic services to its clients. No evidence exists in the record of SIQ selling tangible goods, like envelopes, postal meters, or toner cartridges. Tenan argues that her position at SIQ involved the sale of both services and goods, however, because SIQ clients bought reports from SIQ in conjunction with SIQ's other services. But as another court in this district noted, "[s]imply because [SIQ] may provide some of this . . . information to clients in the form of a data file does not transform that service into a tangible good," or, in other words, "the means by which [SIQ] communicates information with its clients does not change the fact that [SIQ] is *doing* something, as opposed to *making* something." *Springhead*, 2015 WL 1280702, at *3. Because the reports SIQ generated were incidental to the services it provided, these reports do not transform SIQ into a principal bound by the ISRA. *See Johnson v. Safeguard Constr. Co.*, 3 N.E.3d 879, 883, 2013 IL App (1st) 123616, 378 Ill. Dec. 314 (2013) (concluding that the ISRA did not apply where any tangible goods provided by defendant were "merely incidental to the services provided"). Therefore, Tenan cannot recover the commissions she seeks under the statute.

## CONCLUSION

For the foregoing reasons, the Court grants SIQ's motion for summary judgment [176]. The Court enters judgment for SIQ on Tenan's complaint. At the next status hearing, the parties should be prepared to discuss the status of SIQ's counterclaims in light of this Opinion and Order.

Dated: March 5, 2019

_____
SARA L. ELLIS
United States District Judge